UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELANY NORTON,

                         Plaintiff,                    Civil Action No. 20-13391

v.                                                     Judith E. Levy
                                                       United States District Judge
COMMISSIONER OF
SOCIAL SECURITY,                                       David R. Grand
                                                       United States Magistrate Judge
                         Defendant.
_____/

## REPORT AND RECOMMENDATION ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 11, 12)

Plaintiff Melany Norton ("Norton") brings this action pursuant to 42 U.S.C. §
405(g), challenging the final decision of Defendant Commissioner of Social Security
("Commissioner") that she was no longer disabled as of April 11, 2018, and therefore, as
of that date, was no longer entitled to receive the Disability Insurance Benefits ("DIB") she
previously had been awarded under the Social Security Act (the "Act").  Both parties have
filed summary judgment motions (ECF Nos. 11, 12), which have been referred to this Court
for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, the Court finds that substantial evidence supports
the Administrative Law Judge's ("ALJ") conclusion that Norton has not been disabled
under the Act since April 11, 2018.  Accordingly, the Court **RECOMMENDS** that the
Commissioner's Motion for Summary Judgment **(ECF No. 12)** be **GRANTED**, Norton's

Motion for Summary Judgment **(ECF No. 11)** be **DENIED**, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be **AFFIRMED**.

## II.    REPORT

### A.    Background

Norton was 24 years old at the time of her alleged onset date of September 15, 2012, and at 5'7" tall weighed approximately 120 pounds during the relevant time period.  (ECF No. 9, PageID.77, 121, 301, 329).   She completed high school and took some college classes.  (*Id.*, PageID.79).  Over the years, she worked as a food service worker at a hospital and briefly on a part-time basis as a cashier at a gas station (while she was pregnant with her second child).  (*Id.*, PageID.80, 84).  Eventually, she stopped working completely in April 2018 because of her medical conditions. (*Id.*, PageID.372).   She now alleges disability primarily as a result of neurocardiogenic syncope, postural orthostatic tachycardia syndrome ("POTS"), back pain, leg weakness, and chronic fatigue.  (*Id.*, PageID.85, 93, 309, 343).

In a decision dated August 21, 2014, ALJ Jerome Blum found Norton disabled beginning on September 15, 2012.  (*Id.*, PageID.114-20).  On December 13, 2018, on continuing disability review, it was determined that Norton was no longer disabled since April 11, 2018.  (*Id.*, PageID.135).  This determination was upheld on reconsideration after a disability hearing by a state agency disability hearing officer.  (*Id.*, PageID.158-79). Thereafter, Norton timely requested an administrative hearing, which was held on October 9, 2019, before ALJ Virginia Herring.  (*Id.*, PageID.68-109).  Norton, who appeared without the assistance of an attorney or other representative, testified at that hearing, as did

vocational expert ("VE") Elizabeth Pasikowski.  (*Id.*).  On January 22, 2020, the ALJ issued a written decision finding that Norton is not disabled under the Act.  (*Id.*, PageID.41-50).  On October 27, 2020, the Appeals Council denied review.  (*Id.*, PageID.33-37).  Norton timely filed for judicial review of the final decision on December 28, 2020.  (ECF No. 1).

The Court has thoroughly reviewed the transcript in this matter, including Norton's medical record, function and disability reports, and testimony as to her conditions and resulting limitations.  Instead of summarizing that information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

### B.      The ALJ's Application of the Disability Framework Analysis

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Under the eight-step continuing disability review process for DIB recipients, the ALJ must determine at Step One whether the beneficiary engaged in substantial gainful activity at any time after the onset date; at Step Two, whether the beneficiary has an impairment or combination of impairments that meets or medically equals a listed impairment; at Step Three, whether the beneficiary experienced medical improvement; at

3

Step Four, whether the medical improvement was related to the beneficiary's ability to do work; at Step Five, whether an exception to medical improvement applies; at Step Six, whether the beneficiary's current impairments in combination are severe; at Step Seven, whether the beneficiary can perform her past relevant work in light of her current residual functional capacity ("RFC"); and at Step Eight, whether the beneficiary's RFC allows her to perform other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1594(f). "[T]he Commissioner bears the burden of proof at each of these steps." *Delacotera v. Berryhill*, No. 3:16-cv-01464, 2017 WL 971935, at *3 (M.D. Tenn. Mar. 14, 2017). "There is no presumption of continuing disability," and "[i]nstead, the Commissioner applies the above procedures to determine whether the claimant's disability has ended and if she is now able to work." *Reeves v. Comm'r of Soc. Sec.*, No. 1:13-cv-325, 2014 WL 2434112, at *3 (S.D. Ohio May 29, 2014), *report and recommendation adopted*, No. 1:13-CV-00325, 2014 WL 2773258 (S.D. Ohio June 19, 2014) (citing *Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007)).

The ALJ found that between August 21, 2014, and April 11, 2018, Norton suffered from several severe impairments – neurocardiogenic syncope/POTS; moderate broad-based disc protrusion at L5-S1; mild to moderately severe lumbar degenerative disc and facet disease, annual tear at L5-S1, diffuse lumbar bulge; small lumbar disc protrusion off to the right; chronic back pain; moderate to severe T10-T11 disc with mild central canal stenosis; and small central disc protrusion at T8-T9. (ECF No. 9, PageID.43). The ALJ also determined that Norton had not engaged in substantial gainful activity since that date. (*Id.*). The ALJ then found that Norton has not developed any new impairments since

4

August 21, 2014, and her current impairments are the same as those that were present from September 15, 2012, to August 21, 2014.  (*Id.*, PageID.44).

The ALJ concluded that medical improvement occurred on April 11, 2018, and, since that time, there has been an increase in her RFC, meaning that she has been capable of performing sedentary work, with the following additional limitations: occasional climbing of stairs or ramps, stooping, kneeling, crouching, and crawling; must avoid climbing ladders, ropes, or scaffolds; must avoid hazards such as dangerous machinery and unprotected heights; and, due to fatigue and associated symptoms from her physical impairments, she is limited to simple and routine tasks.  (*Id.*).  Citing the VE's testimony, the ALJ next found that Norton is capable of performing a significant number of jobs that exist in the national economy, including inspector (87,000 jobs nationally), sorter (71,000 jobs), and assembler (88,000 jobs).  (*Id.*, PageID.49).  As a result, the ALJ determined that Norton's disability ended on April 11, 2018, and since then, she has not again become disabled under the Act.  (*Id.*, PageID.50).

### C.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted).  The phrase "substantial evidence" is a "term of art …."  *Biestek v. Berryhill*, 139 S. Ct. 1148,

1154 (2019) (internal citations omitted).  "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations."  *Id.* (internal citations omitted). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence … is 'more than a mere scintilla.'"  *Id.* (internal citations omitted).  Specifically, "[i]t means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (internal citations omitted).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001); *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th

6

Cir. 1994) (citations omitted).

#### D.     Analysis

In her motion, Norton raises only one argument – namely, that ALJ Herring's RFC determination is not supported by substantial evidence.  (ECF No. 11, PageID.578-87).  Specifically, Norton argues that the evidence of record shows a lack of improvement, supporting the more restrictive RFC assessed by ALJ Blum in his 2014 decision, including "the need for 'frequent unscheduled breaks/rest periods of one to two hours daily' as well as 'excessive absenteeism consist[ing] of more than four days per month.'"  (*Id.*, PageID.578 (quoting ECF No. 9, PageID.116)).  For the reasons set forth below, the Court disagrees and finds that ALJ Herring's RFC assessment is supported by substantial evidence.

#### 1.     *The Relevant Medical Evidence*

On January 16, 2017, Norton visited her primary care physician, Nicolas Marsheh, M.D. with "worsening" symptoms that included an irregular heartbeat, chest pain, weakness, lightheadedness, and syncope.  (ECF No. 9, PageID.436).  She also reported chronic back pain but indicated it was under control.  (*Id.*).  On examination, her cardiovascular and neurologic functioning were normal.  (*Id.*).  She was not currently taking midodrine or fludrocortisone acetate (Florinef) (*id.*, PageID.437), which previously had been prescribed to treat her POTS (*id.*, PageID.471).  She was given a new prescription for oxycodone.  (*Id.*, PageID.437).

In August 2017, Norton went to her pulmonologist for the first time in three years because she had recently been short of breath, coughing, sneezing, and wheezing.  (*Id.*,

PageID.396). She previously had been diagnosed with asthma and was an everyday smoker. (*Id.*, PageID.399-400). She reported back and joint pain, but denied any neurologic symptoms, fatigue, or shortness of breath, and did not mention syncope or any other POTS-related symptoms. (*Id.*). A physical examination was completely normal (including normal range of motion). (*Id.*, PageID.401).

During a routine office visit with Dr. Marsheh in October 2017, Norton said she had stopped taking her POTS medication because she was two months pregnant, but she was generally doing well and had not experienced any syncopal episodes even without medication. (*Id.*, PageID.408). On examination, her strength, muscle tone, gait, station, and cognitive functioning were all normal. (*Id.*, PageID.408-09).

On March 24, 2018, Norton saw consultative examiner Nicholas Sousa, D.O. in connection with her continuing disability review. (*Id.*, PageID.441-45). She said she had a bulging disc in her thoracic or lumbar spine and that she usually took oxycodone for pain, but she stopped because she was pregnant. (*Id.*, PageID.441). When asked what limitations her back condition caused, she responded that "she has no limitations and is able to perform all activities." (*Id.*). With respect to her POTS and neurocardiogenic syncope, Norton said that she often felt lightheaded, dizzy, and like she was going to pass out, with her most recent episode happening that very week. (*Id.*, PageID.441-42). Norton indicated that her syncope did not cause any limitations other than the need to sit down when she was dizzy. (*Id.*, PageID.442). On examination, her gait, heart sounds, range of motion, motor strength, sensation, and reflexes were all normal, and she "was able to complete all tasks asked of her with no difficulty." (*Id.*, PageID.442-44).

On May 1, 2018, about five weeks after her examination with Dr. Sousa, Norton went to Dr. Marsheh complaining of worsening back and neck pain with left-hand numbness. (*Id.*, PageID.490). She also said she "was denied for Social Security disability and would like to have a letter to support her diagnosis and she already got one from her neurovascular specialist [James Teener, M.D.] at the University of Michigan." (*Id.*). Despite Norton's complaints, Dr. Marsheh observed that her strength, muscle tone, gait, station, and cognitive functioning were all normal (*id.*, PageID.490-91), just as they were when he last examined her seven months earlier (*id.*, PageID.408-09). Nevertheless, Dr. Marsheh provided Norton with a letter stating that she had been diagnosed with "multiple serious medical conditions" and that he "do[es] recommend her not to be working at any profession/job and to go on long term disability, due to the significant limitations in her abilities to perform any job duties even with all kinds of restrictions." (*Id.*, PageID.446).

Norton then gave birth without complication a couple of weeks later. (*Id.*, PageID.447, 451). She went back to Dr. Marsheh's clinic on June 4, 2018 and asked to go back on her medications. (*Id.*, PageID.483). Normal examination findings were noted, and she was restarted on midodrine and Florinef for POTS. (*Id.*, PageID.483-85).

On June 21, 2018, Norton saw nurse practitioner Meredith Smith at the Arrythmia Clinic at the University of Michigan. (*Id.*, PageID.471-73). Nurse Smith noted that, when evaluated in January 2017, Norton had not had syncope "in quite some time." (*Id.*, PageID.471). She further noted Norton's report at her last visit in January 2018 that she had been "doing very well, with only intermittent dizziness and lightheadedness[.]" (*Id.*). At that time, she had "not started the recommended exercise regimen" and was "working

9

part-time." (*Id.*).  Now, Norton complained of increasing symptoms since giving birth. (*Id.*).  Nurse Smith noted that Norton was not following prior instructions to wear compression stockings, salt her foods, and drink plenty of water. (*Id.*).  Nurse Smith again told her to do all those things and to start exercising to strengthen her leg and core muscles. (*Id.*, PageID.473).  She also increased her midodrine dosage for POTS and noted that she was "happy to hear that [Norton] has not had syncope since around 2016 or so." (*Id.*, PageID.472).  Norton also indicated she was "hoping to restart oxycodone as well," but Nurse Smith told her she would have to talk to Dr. Teener or Dr. Marsheh about that. (*Id.*, PageID.473).

Later that day, Norton saw Dr. Teener and reported that she was "very symptomatic" with POTS since giving birth, becoming lightheaded when standing for even a few minutes and developing palpitations with minimal activity. (*Id.*).  Dr. Teener noted that Norton had not yet started taking her POTS medications (which had been prescribed more than two weeks earlier), so he encouraged her to do so, but noted that she "remains unfortunately completely disabled from any meaningful employment by this severe autonomic disturbance." (*Id.*).  Dr. Teener also gave Norton a letter[1] stating that her POTS left her "unable to maintain any ability to work in a competitive workplace[,]" but he did note that "[p]erhaps a part-time position might be doable[,]" as Norton was (as of January 2018) "doing a bit of work in 4 hour shifts once or twice a week at a party store." (*Id.*,

---

[1] Dr. Teener's letter is not signed or dated, but there is a notation at the bottom that "[t]his letter was initially viewed by [Norton] at 4/27/2018 9:49 AM." (ECF No. 9, PageID.528).

PageID.527, 540).[2]

On August 15, 2018, Norton followed up with Dr. Marsheh's clinic, indicating that her POTS symptoms had improved with Florinef, but she still had not started her midodrine prescription. (*Id.*, PageID.515). No signs or symptoms of pain were recorded, but Norton was prescribed oxycodone. (*Id.*).

On November 20, 2018, Dr. Teener met with Norton for 30 minutes and produced a letter to Dr. Marsheh describing her "very difficult hospital [sic] tachycardia syndrome." (*Id.*, PageID.543; *see also id.*, PageID.523-24). Dr. Teener wrote that Norton had palpitations with any type of exertion and could not stand for prolonged periods of time. (*Id.*, PageID.543). He also wrote:

> She [has] not had any further syncopal episodes since being on the midodrine but she continues to be prominently symptomatic. Her orthostatic intolerance results in essentially complete disability. She is unable to be competitive in the workplace really for any type of meaningful employment.

(*Id.*). When Norton returned to see Dr. Teener on January 8, 2019, he again declared her disabled due to "orthostatic intolerance." (*Id.*, PageID.544). He increased her midodrine dosage and added propranolol in an effort to control her "significant symptomatic palpitations and tachycardia." (*Id.*).

On January 22, 2019, Norton underwent an orthopedic evaluation with Maria Porta, PA-C. (*Id.*, PageID.545-48). She reported neck and back pain that radiated down her arms

---

[2] Norton actually was working six- or seven-hour shifts (approximately 15-20 hours per week), not the 4-8 hours that Dr. Teener indicated. (ECF No. 9, PageID.80-81, 154, 161). In fact, her earnings records show six different bi-weekly periods in 2017 and 2018 when she worked more than 40 hours. (*Id.*, PageID.278-81).

and legs, causing pain, numbness, and tingling. (*Id.*, PageID.545). Although she was reporting 10/10 pain at the time, she was "well appearing" and in "no acute distress" upon examination. (*Id.*, PageID.546). She also had a normal, independent gait; she could walk on her heels and toes; her balance was normal; she had 5/5 strength in her upper and lower extremities; her reflexes and sensation were intact; and straight-leg raising, Hoffman, and Spurling tests were all negative. (*Id.*, PageID.546-47). Ms. Porta reviewed a recent MRI of Norton's spine and noted that it showed degenerative changes and a disc bulge at L5-S1, but "without significant spinal cord compression or nerve compression noted." (*Id.*, PageID.547). She opined that Norton did "not have any restrictions or limitations" in her spine, and that she "should use her body as a guide for activities." (*Id.*).

On February 28, 2019, electrophysiologist Aman Chugh, M.D. evaluated Norton for POTS/orthostatic intolerance. (*Id.*, PageID.548-49). He noted that he first saw Norton "many years ago" and instituted lifestyle changes and medications that stopped her syncope episodes. (*Id.*, PageID.548). He also noted that her symptoms were "reasonably well controlled" with midodrine and Florinef, and Norton reported that "she has not had syncope in quite some time." (*Id.*). Dr. Chugh did not believe that Norton's alleged symptoms ("fatigue and feeling poorly") were due to tachycardia or blood pressure problems, "since her vital signs are within normal limits." (*Id.*, PageID.549). He advised Norton to take Florinef at least once a day, increase her salt intake, and follow up in one year. (*Id.*).

On September 19, 2019, Norton saw Dr. Teener again, who advised her to split her POTS medications into smaller doses and referred her to the spine program in physical medicine and rehabilitation for her back pain. (*Id.*, PageID.553). He again indicated that

12

"she remains disabled by the combination of her postural tachycardia syndrome and her back pain" but indicated a return visit was not necessary for six months. (*Id.*).

       2.    *ALJ Herring's RFC Finding is Supported by Substantial Evidence*

In her decision, ALJ Herring concluded that medical improvement occurred on April 11, 2018, and, since that time, Norton has had the RFC to perform sedentary work, with the following additional limitations: occasional climbing of stairs or ramps, stooping, kneeling, crouching, and crawling; must avoid climbing ladders, ropes, or scaffolds; must avoid hazards such as dangerous machinery and unprotected heights; and, due to fatigue and associated symptoms from her physical impairments, is limited to simple and routine tasks. (ECF No. 9, PageID.44).

The Commissioner asserts that "[t]he record contains more than enough evidence to persuade a reasonable mind that [Norton's] previously disabling impairments improved to the point where she could perform simple, sedentary work[.]" (ECF No. 12, PageID.606-07 (citing ECF No. 9, PageID.38-55 and *Biestek*, 139 S. Ct. at 1154)). In support of her argument, the Commissioner points to the following evidence, which was specifically noted by ALJ Herring in her decision:

- Norton worked part-time as a cashier in 2017 and 2018. (ECF No. 9, PageID.43, 273-91)).

- Norton was pregnant from August 2017 until May 2018 and reported feeling quite well, with no POTS symptoms during her pregnancy. (*Id.*, PageID.46, 447).

- According to a June 2018 treatment note, Norton had not had a syncopal episode in two years, even though she was non-compliant with all recommended treatment for POTS, including water intake, salt intake,

compression stockings, and medications.  (*Id.*, PageID.46-47, 471-73, 540-42, 553).

- Norton was still syncope-free as of November 2018.  (*Id.*, PageID.46, 522, 553).

- Norton reportedly was able to drive a vehicle without difficulty (*id.*, PageID.45,79), despite restrictions on driving due to POTS symptoms at the time of the 2014 decision (*id.*, PageID.117, 128).

- Recent imaging studies showed only mild degenerative changes and a disc bulge in Norton's spine without spinal cord or nerve root compression.  (*Id.*, PageID.45, 545-47).

- A recent orthopedic examination showed that Norton had no motor, reflex, or sensory deficits and required only conservative treatment.  (*Id.*, PageID.45-46, 532, 545-47).  Despite those benign findings, Norton solicited an opinion from Dr. Marsheh that her back condition was disabling.  (*Id.*, PageID.45, 490).

As the Commissioner points out, this Court's role is not to second-guess ALJ Herring's evaluation of the conflicting evidence but, rather, to determine whether it clears the substantial evidence bar, which the Supreme Court has recently characterized as "not high."  (ECF No. 12, PageID.608 (citing *Biestek*, 139 S. Ct. at 1154)).  Here, it does clear that bar, as ALJ Herring supportably found that Norton's back and cardiovascular symptoms had significantly improved and that there was very little objective evidence of functional impairment, notwithstanding the fact that Norton obtained statements that she is totally disabled from Dr. Marsheh, Dr. Teener, and Soodad Rabban.[3]  Because ALJ Herring's assessment of the conflicting evidence falls within the statutory "zone of choice," *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986), the Court must decline Norton's

---

[3] Soodad Rabban wrote a letter on Forum Medical Clinic letterhead stating that Norton "is disabled."  (ECF No. 9, PageID.534).  Rabban did not provide credentials, and there is no indication that Norton actually saw her.

14

invitation to "decide the question differently based on the same evidence." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017).

In the face of all of the evidence cited above, Norton raises several challenges to ALJ Herring's decision, each of which is discussed below.  First, Norton argues that ALJ Herring erred in finding Dr. Marsheh's and Dr. Teener's disability statements "neither valuable [n]or persuasive" as they simply concluded that Norton was disabled, rather than providing any functional limitations.  (ECF No. 11, PageID.578-79; *see* ECF No. 9, PageID.47).  But, the governing regulations provide that conclusory statements that a patient is disabled or unable to work – such as the ones provided by Drs. Marsheh and Teener – are "inherently neither valuable nor persuasive," because they encroach upon the Commissioner's exclusive responsibility to adjudicate disability claims.  20 C.F.R. § 404.1520b(c); *see also Jasman v. Saul*, No. 20-11314, 2021 WL 4270950, at *7 (E.D. Mich. June 24, 2021) (ALJ properly rejected doctor's opinion addressing the issue of disability "which is reserved solely for the Commissioner").  Thus, the Court finds no error in ALJ Herring's evaluation of these two disability statements.

Second, Norton argues that "the ALJ failed to consider that each of these opinions are [sic] consistent with the prior administrative finding of 'disabled' documenting an overall lack of significant improvement since 2014."  (ECF No. 11, PageID.579).  This argument misrepresents the 2014 decision and ignores the fact that, at the time ALJ Blum found Norton disabled, he specifically noted that "[m]edical improvement is expected with appropriate treatment[,]" and that a continuing disability review should be conducted in three years to assess Norton's response to treatment.  (ECF No. 9, PageID.120).  This is

15

consistent with the continuing disability review framework discussed above, which required the ALJ to determine whether Norton experienced medical improvement by evaluating the record evidence subsequent to the prior decision, without any presumption of continuing disability. *See Reeves*, 2014 WL 2434112, at *3. The SSA conducted that review according to the regulations and supportably found that Norton had, in fact, improved. (ECF No. 9, PageID.121-83). As discussed above, the record support includes that: (1) in January 2017, Norton, while complaining of some symptoms, reported that her back pain was under control; (2) Norton worked part-time in 2017 and 2018; (3) Norton did not mention any issues with syncope in August of 2017, and her physical examination was normal; (4) on March 24, 2018, Dr. Sousa noted Norton's indication that "she has no limitations and is able to perform all activities," and that on examination, her gait, heart sounds, range of motion, motor strength, sensation, and reflexes were all normal, and she "was able to complete all tasks asked of her with no difficulty"; (5) on May 1, 2018, Dr. Marsheh observed that Norton's strength, muscle tone, gait, station, and cognitive functioning were all normal, just as they were when he last examined her seven months earlier; (6) and on January 22, 2019, Norton underwent an orthopedic evaluation with Maria Porta, PA-C, who found her "well appearing," in "no acute distress," with a normal, independent gait, normal balance, 5/5 strength, and no restrictions or limitations in her spine. *See supra* at 7-12.

Third, Norton asserts – without further explanation or elaboration – that "throughout the records, the doctors find that [she] is clearly still disabled due to her severe autonomic disturbance and *provide substantial support by way of routine subjective complaints and*

*objective testing that bolster the overall persuasiveness of their opinions*."  (ECF No. 11, PageID.579 (emphasis added)).  Although Norton cites to four specific pages in the record in support of this argument, she makes no effort to explain how the cited references support the opinions of Dr. Marsheh or Dr. Teener.  Thus, this argument is underdeveloped and therefore waived.  *See, e.g., McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  Moreover, the records referenced by Norton include notes such as, "she is doing okay but does have some symptoms," "[p]erhaps a part-time position might be doable" (which was based on the incorrect belief she had been working "in 4 hour shifts once or twice a week at a party store" when in fact she had been working six- or seven-hour shifts, *see supra* at 11 n.2), "[w]hen evaluated on 1/19/2017, she admitted that the combination of medications had improved her quality of life, but she still had 'bad days,'" "[s]he had not had syncope in quite some time," "[s]he was encouraged to try a strength-training regimen," "ECG was normal and ultrasound did not show anything concerning," and "[t]hese problems are being addressed but at this time she does remain disabled by this combination of signs and symptoms."  (ECF No. 9, PageID.540, 543-44, 553).  And, in the newest of the records cited by Norton, dated January 9, 2019 and September 19, 2019, Dr. Teener indicated that he only wanted to see her after the passage of 4 and 6 months, respectively.  (*Id.*, PageID.544, 553).  Thus, while it is true that some of these records reference Norton's "symptoms," they do not overcome the substantial evidence that supports the ALJ's analysis.  Moreover, as discussed above, these

17

records contain only the doctor's conclusory assertion about Norton being "disabled," and do not provide any specific functional limitations.

Fourth, Norton argues that ALJ Herring's assessment "fails to include additional limitations supported by substantial evidence of record, including [her] consistent testimony and routine reports [] to her physicians."[4]  (ECF No. 11, PageID.579-80).  As the Commissioner points out, however, this argument turns the standard of review on its head; because substantial evidence supports ALJ Herring's conclusions that Norton's conditions improved and were not disabling, the Court must affirm that conclusion, "even if substantial evidence also supports the opposite conclusion."  *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020) (internal quotations omitted).

Fifth, Norton argues that ALJ Herring misstated the record when she indicated that Norton mentioned back pain at only two doctors' visits – in January and September 2019. (ECF No. 11, PageID.580).  Indeed, Norton cites to several other instances in which she mentioned her neck, mid back, and low back pain.  (*Id.*).  But ALJ Herring did *not* say that there were only two mentions of back pain in the entire record; rather, in the portion of

---

[4] The Court notes that the record belies Norton's assertion that her testimony and reports are "consistent."  For example, Norton reported that she stopped taking POTS medications because she was pregnant (ECF No. 9, PageID.94, 166, 336, 408, 471), but the record clearly shows these medications as "inactive" in January 2017, well before she became pregnant (*id.*, PageID.437). Similarly, during an August 2017 examination, Norton denied any neurologic symptoms, fatigue, or shortness of breath (*id.*, PageID.399), which is inconsistent with her later reports that those symptoms have been continuously and completely debilitating since 2012.  And, Norton told Dr. Chugh that her orthostatic symptoms were "reasonably well controlled" and she had "not had syncope in quite some time" (*id.*, PageID.548) at the same time she was describing orthostatic symptoms to Dr. Teener that prompted him to opine that she was completely disabled, even with medication (*id.*, PageID.543-44, 553).  These are just a few examples of inconsistent statements made by Norton throughout the record.

18

ALJ's decision that Norton is focusing on here, the ALJ was merely summarizing – in chronological fashion – some of the more recent records.   Specifically, the ALJ summarized Norton's January 2019 visit to PA Porta for back pain (ECF No. 9, PageID.45-46), and then noted that "[t]he *next and only other treatment or mention* of [Norton's] back issues is in September 2019 …." (*Id.*, PageID.46 (emphasis added)).   Thus, read in context, ALJ Herring was merely noting that Norton was not treated for back pain *between January and September 2019*, not that those were the only two records mentioning the condition. This point becomes even more clear when read in conjunction with an earlier paragraph in the ALJ's decision where she referred to evidence that (1) Norton went to Dr. Marsheh in May 2018 "requesting a letter to support her back issues for Social Security disability"; and (2) Dr. Marsheh started Norton "on narcotic medication in August 2018 for her back complaints."   (ECF No. 9, PageID.45 (citing *Id.*, PageID.490, 515)).   Thus, there is no merit to Norton's argument that ALJ Herring misrepresented the record.   Moreover, as discussed above, the record contains consistent reports of full range of motion and no other motor or neurologic deficits.  *See supra* at 7-12.

Sixth, Norton relies on a selective summary of "critically important records" that she contends ALJ Herring failed to consider.  (ECF No. 11, PageID.581-87).  But, a review of the ALJ's decision reveals that she considered all of the evidence that Norton accuses her of ignoring – including her regular medication adjustments (ECF No. 9, PageID.46), her difficulty swallowing pills (*id.*, PageID.47), and her alleged side effects (*id.*) – yet found that such evidence did not support disabling restrictions.  (*Id.*, PageID.45-49).  As ALJ Herring noted, even Dr. Teener felt that Norton could do more to incorporate POTS

medication into her regimen, instead of simply refusing to take it altogether.   (*Id.*, PageID.47 (citing *id.*, PageID.553)).   Again, ALJ Herring's evaluation of the competing evidence falls within a statutory "zone of choice" and should not be disturbed.  *See Mullen*, 800 F.2d at 545.

Finally, Norton argues in passing that ALJ Herring "does not even take into account how often [her] severe conditions and symptoms would cause her to be off-task throughout a workday as well as how often [she] would be absent because of them."  (ECF No. 11, PageID.587).  But, Norton does not point to any competent evidence undermining ALJ Herring's finding that she no longer requires off-task/absenteeism restrictions; as noted above, none of her doctors' opinions from the relevant period impose those restrictions. Although the Commissioner had the burden to produce substantial evidence in support of medical improvement, *Delacotera*, 2017 WL 971935, at *3, that threshold is "not high," *Biestek*, 139 S. Ct. at 1154, and the evidence she cited exceeds it.  Because ALJ Herring reasonably found that the record no longer supports off-task/absenteeism restrictions, she properly excluded them from her RFC assessment.  *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

In sum, substantial evidence review in Social Security disability cases is not an "either-or" proposition.  The law provides that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip*, 25 F.3d at 286 (citations omitted).  *See also McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen*, 800 F.2d at 545.  Here, Norton's evidence is

insufficient to detract from the substantial evidence in the record that supports ALJ Herring's decision. Thus, the ALJ's decision falls well within the allowable "zone of choice," and that decision should be affirmed.

## III. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(ECF No. 12)** be **GRANTED**, Norton's Motion for Summary Judgment **(ECF No. 11)** be **DENIED**, and the ALJ's decision be **AFFIRMED**.

Dated: September 27, 2021          s/David R. Grand
Ann Arbor, Michigan               DAVID R. GRAND
                                  United States Magistrate Judge

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Within 14 days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. L.R. 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. L.R. 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 27, 2021.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager